IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

REBECCA A. SHEPHERD,               )
                                   )
                Plaintiff,         )
                                   )
v.                                 )        No. 2:07-CV-028
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
                Defendant.         )

## MEMORANDUM OPINION

 This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claim for disability insurance and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act. For the reasons provided herein, defendant's motion for summary judgment [doc. 14] will be granted, and plaintiff's motion for summary judgment [doc. 10] will be denied.

I.

*Procedural History*

 Plaintiff was born in 1974. She applied for benefits in August 2003, claiming to be disabled by manic depressive disorder, post-traumatic stress disorder, personality disorder, seizures, "psychotic seizures," diabetes, asthma, bronchitis, a hernia, ulcers, "a small brain tumor above my right eye," "bone problems," and other unspecified respiratory

difficulties.  [Tr. 51, 58, 471].  She claimed that, "[I] can't sit and concentrate or stay up very long. [I] have seizures a lot." [Tr. 58].  Plaintiff alleged a disability onset date of July 12, 2003.  [Tr. 51, 471].  Her applications were denied initially and on reconsideration.

Plaintiff then requested a hearing, which took place before an Administrative Law Judge ("ALJ") on November 16, 2004.  Following plaintiff's testimony, the ALJ recessed the hearing so that he could refer plaintiff for a psychological evaluation.  A second hearing was held on July 20, 2005, for the purpose of taking medical and vocational expert testimony.

On August 22, 2005, the ALJ issued a decision denying benefits.  He concluded that plaintiff suffers from "epilepsy (controlled with medication), degenerative disc disease, with chronic pain and depression (with good response to treatment if the claimant is compliant with recommendations)," which are "severe" but not equal, individually or in concert, to any impairment listed by the Commissioner.  [Tr. 22].  Terming plaintiff's subjective complaints "not totally credible," the ALJ found her to have the residual functional capacity ("RFC") at the sedentary level of exertion restricted to "lower level entry work, with few social demands and working with things rather than . . . people." [Tr. 22-23, 25].  Relying on vocational expert testimony, the ALJ determined that plaintiff remained able to perform a significant number of jobs existing in the regional and national economies.  [Tr. 24, 26].  Plaintiff was accordingly deemed ineligible for benefits.

Plaintiff then sought, and was denied, review from the Commissioner's Appeals Council, despite the submission and consideration of additional medical records. [Tr. 6, 9].[1] The ALJ's ruling therefore became the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481. Through her timely complaint, plaintiff has properly brought her case before this court. *See* 42 U.S.C. § 405(g).

## II.

### *Applicable Legal Standards*

This court's review is confined to whether the ALJ applied the correct legal standards and whether his factual findings were supported by substantial evidence. 42 U.S.C. § 405(g)*; Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to

---

[1] Plaintiff's additional documents are discussed in her brief and are included in the administrative record. [Tr. 487-511]. "[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision." *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted). This court can, however, remand a case for further administrative proceedings, but only if the claimant shows that her evidence meets each prong of the "new, material, and good cause" standard of sentence six, 42 U.S.C. § 405(g). *Id.* Despite repeated prior admonitions from this court in other cases, the present plaintiff's law firm has made no effort to articulate how the late-submitted evidence warrants sentence six remand, nor is sentence six even addressed in plaintiff's briefing. The issue is accordingly waived, and plaintiff's additional medical evidence has *not* been considered. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("Plaintiff has not only failed to make a showing of good cause, but also has failed to even cite this relevant section or argue a remand is appropriate."); *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted); *Nw. Nat'l Ins. Co. v. Baltes*, 15 F.3d 660, 663 (7th Cir. 1994) ("Lawyers and litigants who decide that they will play by rules of their own invention will find that the game cannot be won.").

3

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

A claimant is entitled to disability insurance payments if she (1) is insured for disability insurance benefits, (2) has not attained retirement age, (3) has filed an application for disability insurance benefits, and (4) is under a disability. 42 U.S.C. § 423(a)(1). "Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423 (d)(2)(A).[2]  Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520).  Plaintiffs bear the burden of proof during the first four steps.  *Walters*, 127 F.3d at 529.  The burden shifts to the Commissioner at step five.  *See id*.

III.

*Background*

Plaintiff stands 5' 6" tall and weighs between 316 and 362 pounds.  [Tr. 141-42, 355, 445].  She has worked at jobs including cashier, cleaner, census enumerator, laborer,

_____

[2] A claimant is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability.  42 U.S.C. § 1382.  "Disability," for SSI purposes, is defined the same as under § 423.  42 U.S.C. § 1382c(a)(3).

parking lot attendant, and security officer.  [Tr. 59, 96].

Plaintiff attended school into the eleventh grade and later obtained a G.E.D. [Tr. 519].  She claims that she dropped out of school in order to get married.  [Tr. 423]. Elsewhere, however, she told the Commissioner that she quit school in 1991 [Tr. 121] and that she married her first husband in 1996.  [Tr. 51].

This discrepancy, while minor in its overall relevance, is illustrative of the striking mass of inconsistencies appearing in plaintiff's statements to the Commissioner and to her various medical sources.  As such, credibility is a central issue in this appeal.  The administrative record has accordingly been summarized below in chronological sections, in an effort to more sharply contrast plaintiff's allegations versus the objective evidence present in the records of her medical providers.

IV.

*Plaintiff's Allegations v. Relevant Medical Evidence*

A. <u>2003</u>

1. <u>Allegations</u>

Plaintiff completed a "Disability Report - Adult" on August 19, 2003.  She stated that she stopped working on July 12, 2003, because "my condition caused me to have to stop working and my doctor told me that [I] could not be getting stressed or upset."  [Tr. 58].[3]

---

[3]  The court has combed the medical record and has not located any such recommendation.

Plaintiff completed an "Activities of Daily Living Questionnaire" on September 20, 2003. Therein, she stated that "people . . . don't want me to use the stove" because she forgets to turn it off and will "burn the house down." [Tr. 89, 91]. Plaintiff admittedly can drive, but only "if someone is with me[.]" [Tr. 90]. She purportedly needs help grocery shopping because the food she selects "isn't healthy." [Tr. 91]. Her regular diet includes bologna, "chips, ice cream, snack cakes and ravioli." [Tr. 90]. In addition to her allegations of seizures and mental infirmity, plaintiff stated that her activities are further restricted by difficulty sitting and walking and by occasional difficulty breathing outdoors. [Tr. 92]. She also claimed that "each day" she "can't breathe until I have been awake an hour or two." [Tr. 94]. Plaintiff takes her various medications only "if I remember," yet is admittedly able to adhere to a regular schedule of television programs "that I don't miss." [Tr. 92, 94].

Nancy Crumbley, who identifies herself as plaintiff's mother, completed a "Function Report - Adult - Third Party" on September 19, 2003.[4] The same form was also completed that date by Wanda Hartsell, who identifies herself as plaintiff's stepmother but who plaintiff identifies as her "dad's girlfriend." [Tr. 57, 79]. Each form portrays plaintiff as a "slow minded and slow moving" virtual invalid who can rarely be left alone while awake due to frequent seizures and who has "no interest in anything now but video games and T.V."

---

[4] The "Function Report - Adult - Third Party" is the Commissioner's form SSA-3380-BK. The form must be signed and dated by the person completing it, beneath a bold font affirmation that reads in material part, "I declare under penalty of perjury that I have examined all the information on this form . . . and it is true and correct to the best of my knowledge." [Tr. 78, 87].

[Tr. 71, 78, 86].[5]

Ms. Crumbley and Ms. Hartsell stated that plaintiff's days are spent watching television, playing video games and "eat[ing] junk all day unless someone fixes [illegible]." [Tr. 70-71, 79]. According to Ms. Crumbley, plaintiff can grocery shop "2 times a week and it don't take long because she buys junk." [Tr. 73].

Ms. Crumbley asserted that plaintiff no longer cooks due to "dangerous" fire safety concerns. [Tr. 72]. Similarly, Ms. Hartsell claimed that plaintiff "[c]annot use stove safely." [Tr. 81]. Neither woman, however, expressed any fire safety concern regarding plaintiff's smoking - as would be expected if plaintiff in fact is as absent-minded as alleged. [Tr. 139, 143, 315].

According to Ms. Crumbley, plaintiff can perform only minimal housework because she "stumbles a lot[.]" [Tr. 72]. Ms. Hartsell offered a similar concern, stating that plaintiff "falls a lot." [Tr. 82]. According to plaintiff and Ms. Hartsell, plaintiff is "20 points from being blind in left eye." [Tr. 84, 92]. Ms. Crumbley claimed that plaintiff cannot pay attention to anything for more than one minute, cannot follow written instructions of more than two words, and essentially cannot follow oral instructions at all. [Tr. 75].

_____

[5] According to Ms. Crumbley, plaintiff is primarily cared for by her roommate, "but he works so one of the family has to stay with her while he is working." [Tr. 70, 78]. Ms. Crumbley twice claimed that the roommate is a certified nursing assistant [Tr. 70, 78] but elsewhere, inexplicably, stated that he works at a "store." [Tr. 74]. In another version of the facts, the August 18, 2003 notes of Cherokee Mental Health ("Cherokee") indicate that plaintiff lives with her "boyfriend" who is "employed at Time Out Market." [Tr. 194]. Regardless, both Ms. Crumbley and Ms. Hartsell asserted that plaintiff "regularly" goes to the store where her purported caregiver is employed and "play[s] games while her friend work[s]." [Tr. 74, 83].

Ms. Crumbley and Ms. Hartsell asserted that plaintiff's seizures each last a minimum of ten minutes *and as long as one to two hours*. [Tr. 104-05]. Ms. Hartsell has admittedly never seen plaintiff have a seizure but purports to "have been there afterwards when the paramedics was taking her away." [Tr. 104].

### 2. Medical Evidence

On May 1, 2003, plaintiff was treated at the Baptist Hospital of Cocke County emergency room for a "possible seizure." [Tr. 260-61, 266]. Plaintiff explained that she had been on seizure medication briefly in 1999 but had stopped taking the medication in order to conceal her seizures from her employer. [Tr. 258]. The emergency room provided plaintiff a prescription for the seizure medication Tegretol and released her to return to work the following day. [Tr. 256].[6]

A May 2003 MRI confirmed a twelve millimeter lipoma above the right eye, but with "[n]o acute intracranial process demonstrated." [Tr. 172].[7] An EEG performed the same day was "moderately slow" and thus "mildly and nonspecifically abnormal[.]" [Tr. 171].

---

[6] This is the only evidence of any emergency room treatment for a possible seizure. Although Ms. Hartsell insists that she has "been there afterwards when the paramedics was taking her away" [Tr. 104], plaintiff was in fact taken to the emergency room on this occasion by her "fiancee" in a private vehicle approximately nine hours after the alleged event. [Tr. 255, 257-58].

[7] A lipoma is benign, soft tumor "usually composed of mature fat cells[.]" *Dorland's Illustrated Medical Dictionary* 1016 (29th ed. 2000).

Plaintiff had a followup appointment on May 12, 2003, with nurse practitioner Michael Manting. There, she explained that "[s]he quit taking her seizure medication when she was working at Dollywood driving a tram." [Tr. 142]. At her next appointment on June 2, 2003, there had been "[n]o recent seizure activity." [Tr. 141]. There were also no seizure complaints at her next appointments with FNP Manting in August and September 2003. [Tr. 137-39].

Plaintiff visited with ophthalmologist John Carson in June 2003 and mentioned worsening seizures. [Tr. 238]. Dr. Carson's examination "showed no evidence of diabetic retinopathy" and he observed no tumor around the right eye. [Tr. 239]. The following month, plaintiff again reported that her seizures were becoming more frequent and violent. [Tr. 237]. Despite a possible diagnosis of diabetes [Tr. 298], plaintiff reported that she does not check her blood sugar regularly. [Tr. 237]. Dr. Carson's review of plaintiff's MRI did confirm the lipoma above the right eye. [Tr. 237]. He referred plaintiff to a neurosurgeon for further review. [Tr. 236]. The court's review of Dr. Carson's largely handwritten notes does not reveal a diagnosis of cataracts or an assessment that plaintiff is "20 points from being blind in left eye."

Plaintiff then saw neurosurgeon Bert Meric on August 7, 2003, regarding "a long history of headaches with about 10 years of a seizure disorder, although she has not seen a neurologist." [Tr. 243]. Dr. Meric referred to plaintiff's description of her seizures as "somewhat unusual." [Tr. 243]. He described plaintiff as "[a]wake, alert, and oriented.

10

Speech is clear with good content. Memory, attention span, and cognition seem to be at reasonable baseline for patient." [Tr. 244]. Examination of the upper and lower extremities was unremarkable. [Tr. 244]. Dr. Meric described plaintiff's lipoma as "a fat tissue density just superior to the right orbit . . . . *There is no mass effect on the orbit or on the brain from this mass*." [Tr. 245] (emphasis added). Dr. Meric recommended,

> There is nothing surgical to offer for this lesion since it does not appear to be causing any of her symptoms, is not responsible for her visual field deficit, and is not the cause of her headaches or her long-term seizures. . . . [S]he definitely needs to see a neurologist since she has a long-standing seizure disorder and is having breakthrough seizures on Tegretol.

[Tr. 245].

A September 2003 lumbar MRI showed facet joint disease at multiple levels but no herniation or significant stenosis. [Tr. 169]. Plaintiff sought emergency room treatment on September 1, 2003, for back pain secondary to moving boxes and furniture the previous night. [Tr. 252]. Plaintiff subsequently complained to FNP Manting of pain and numbness purportedly secondary to a right buttock injection received at the emergency room after her furniture moving incident. [Tr. 137]. She then sought treatment from a different hospital's emergency room. The diagnosis was sciatica of the right hip. [Tr. 283, 288].[8] Plaintiff told the emergency room staff that she has a tumor on the right side of her brain [Tr. 284] causing the staff to "suggest that [she] follow up with a neurologist." [Tr. 283].

---

[8] Sciatica is "pain anywhere along the course of the sciatic nerve." *Dorland's Illustrated Medical Dictionary* 1609 (29th ed. 2000).

Nurse practitioner Manting has "urged" plaintiff to stop smoking. [Tr. 140, 143]. In August 2003 - less than one month after the alleged onset of her disability - plaintiff advised FNP Manting that "[s]he has tried dieting and exercise and is unable to lose weight" and thus was now contemplating "taking cocaine as she was told this would curb her appetite." [Tr. 139].[9] In response, FNP Manting engaged plaintiff in a "[d]iscussion regarding health effects of cocaine use, including addiction, [stroke], poor glucose control and decreased seizure threshold. [He] strongly urged patient to avoid illegal drugs." [Tr. 140]. His office also mailed diabetic diet instructions to plaintiff in November 2003. [Tr. 160].

At a November 10, 2003 appointment, plaintiff told FNP Manting that she was not experiencing any headaches or recent seizures. [Tr. 368]. On November 26, 2003, plaintiff complained to FNP Rachel Mathers of recent headaches which had resolved with the discontinuation of the hypertension medication Altace. [Tr. 133]. Plaintiff denied having shortness of breath and presented no seizure complaints. [Tr. 133]. Plaintiff claimed to have "modified her diet recently and is making small changes on a regular basis." [Tr. 133].

The administrative record contains diagnoses of major depressive disorder as early as July 2001 by psychiatrist Kenneth Greenwood. [Tr. 222]. Counseling in the year 2002 and 2003 appeared to focus on relationship problems with plaintiff's husband and

---

[9] When juxtaposed with the numerous September 2003 admissions by plaintiff and her family that she spends her days eating "junk" and watching television, her August 2003 claim of having "tried diet and exercise" is questionable at best.

boyfriend. [Tr. 198, 206-07]. She reported that Wellbutrin usage "has been a really wonderful addition to her medication." [Tr. 206].

In August 2003, plaintiff presented at Cherokee claiming to be "having a mental breakdown" but was noted to be unable to "identify a precipitating factor." [Tr. 194]. At a September 9, 2003 appointment with psychiatrist Greenwood, plaintiff reported that she had been in school, working 12 to 16 hour days, and "doing fairly well on her medicines . . . [until she] just ran out of her medicine and got off of it." [Tr. 193]. Plaintiff complained of hypertension, asthma, diabetes, and obesity but did not mention any problems with seizures. [Tr. 193]. Dr. Greenwood described plaintiff as alert and oriented with fair mood, average effect, and "goal directed and sequential" thoughts. [Tr. 193].

At the next documented counseling appointment almost three months later, psychiatrist Shirley Trentham recorded plaintiff's report that she "has tolerated the Zoloft well and states she believes it is helping more than some of the other antidepressants that she has taken in the past." [Tr. 192]. Plaintiff continued to complain of chronic pain and problems with her boyfriend. [Tr. 192]. Psychiatrist Trentham described plaintiff as pleasant, cooperative, tearful, depressed, and congruent, with "logical and goal directed" thoughts, good insight, and good judgment. [Tr. 192].

A state agency medical source (signature and title illegible) completed a Mental RFC Assessment in November 2003. No limitations were predicted of more than a moderate degree, and the source opined that plaintiff "can do lower level detailed work . . . [and] will

do better in work settings with few social demands - work with things, not people." [Tr. 333-35].

A September 2003 polysomnogram indicated no sleep apnea. [Tr. 414-15]. Dr. Ernesto Mejia recommended weight loss and bedtime oxygen supplementation. [Tr. 415].

FNP Manting referred plaintiff to pain consultant Michael Chavin in October 2003. Lumbar x-rays were unremarkable [Tr. 310] and an MRI showed some joint disease of the right shoulder. [Tr. 309]. Plaintiff continued to complain of seizures. Dr. Chavin's office expressed concern that she was taking the medications Wellbutrin and Risperdal, as both are "contraindicated in seizure disorder." [Tr. 298]. Dr. Chavin described plaintiff as "stiff . . . because of pain." [Tr. 298]. He diagnosed probable nerve injury in the right buttock and prescribed narcotic pain relief [Tr. 299], further stating,

> Weight loss would be extremely helpful. The facet joints have already become osteoarthritic at age 29, which is abnormal and this is likely due to the excessive weight gain placed on the facet joints from the obesity. A low carb diet with adequate protein might be helpful. . . . [W]eight loss is going to be a major and important issue for her back pain long term as well as her mental status.

[Tr. 300]. Dr. Chavin also prescribed Valium and Gabitril in place of Wellbutrin and Risperdal. [Tr. 300].

Plaintiff had a followup appointment with Dr. Chavin two weeks later. The office notes provide in material part that

> . . . it seems that the medications are over all helpful. She has had an improved quality of life. She is alert, she is not over sedated, there is no memory impairment and she sleeps better.
>
> . . .
>
> On exam there is a lot of pain over the right paraspinous region over the facets and also over the right sacroiliac joint. The pain is generally non-radicular, but in a pattern consistent with both facet pain and sacroiliac joint pain. . . . I have ordered her a cane to help her ambulate.

[Tr. 296]. Over the next six weeks, Dr. Chavin performed a series of epidural injections with minimal reported relief. [Tr. 293]. He again noted "hypertrophic changes of the facets bilaterally which I believe is associated with her obesity." [Tr. 294]. Plaintiff "state[d] [he had] improved her quality of life and activity level." [Tr. 293]. Plaintiff rated her pain as five out of ten with no medication side effects. [Tr. 293].

## B. January through October 2004

### 1. Allegations

By a "Disability Report - Appeal" signed on February 6, 2004, plaintiff claimed to be "living on pain and nerve pills" due to new diagnoses of bipolar disorder, high blood pressure, high cholesterol, gallbladder disease, "surgical procedures on my back," and "sciatica nerve damage" in the right hip. [Tr. 108]. In April 2004, due to purportedly intractable pain, her daily activities remained "reading, watching tv, playing games." [Tr. 112-13]. She allegedly no longer left her residence except for doctor's appointments "and sometimes to the store." [Tr. 116]. Her back and hip allegedly "hurt non-stop." [Tr. 116]. Despite these dire complaints, she continued to take her medications only "when I remember

to take them." [Tr. 122].

Plaintiff remained able to grocery shop with and without assistance. [Tr. 119]. Despite contrary physician recommendations regarding her purportedly disabling conditions, she continued to "like to buy junk food a lot." [Tr. 119]. Her regular diet included "potted meat with corn chips and Vienna sausages." [Tr. 118].[10]

Plaintiff purportedly still needed assistance using a stove due to fire safety concerns. [Tr. 119]. She further claimed "shortness of breath and I have to use oxygen." [Tr. 116]. She continued to smoke. [Tr. 132, 235, 353, 356].

## 2. Medical Evidence

Plaintiff had followup appointments with Dr. Chavin's office in January, February, and March of 2004. [Tr. 289-92]. She described her pain as seven or eight out of ten. [Tr. 289, 291]. She was alert and functional, ambulatory without assistance, and reporting an improved quality of life without medication side effects. [Tr. 289-92]. Plaintiff twice claimed to be "working on her diet and exercise plan[.]" [Tr. 289, 291].[11]

Dr. Robert Burr completed a Physical RFC Assessment in January 2004. He predicted that plaintiff could work at the light level of exertion [Tr. 338], with no climbing of ladders, ropes, or scaffolds [Tr. 339], no concentrated exposure to respiratory irritants, and

---

[10]  The February 2, 2004 notes of FNP Manting reflect plaintiff's assertion that "[s]he has increased exercising at home" and "is trying to follow the prudent diet." [Tr. 132]. In light of the above-cited admissions regarding sedentary lifestyle and "junk food," the court again finds plaintiff's claims to be extraordinarily doubtful.

[11]  *See* footnote 10.

no exposure to hazards such as machinery and heights [Tr. 341].

Plaintiff made no mention of seizure complaints at a February 2, 2004 appointment with FNP Manting, whose records no longer contained a standing diagnosis of seizure disorder. [Tr. 132]. Plaintiff reported "[n]o depressive symptoms." [Tr. 132]. She was counseled regarding smoking cessation, increased exercise, and "prudent diet." [Tr. 132].

Plaintiff returned to psychologist Trentham for an April 2004 appointment. She was described as doing "fairly well with the medications as currently written," although she presented complaints of sleeping problems and did "not feel there has been a significant improvement yet with the Effexor." [Tr. 395]. However, plaintiff then "disclosed that she had been taking the Effexor 'whenever I remember to take it.' Often she will wait until up in the day to take it, which may be partially accounting for some of her sleep problems." [Tr. 395]. Dr. Trentham continued to diagnose major depressive disorder, "recurrent, improving." [Tr. 395]. She described plaintiff as pleasant, cooperative, goal directed, and logical, with "okay" mood and "fair" insight and judgment. [Tr. 395].

Plaintiff returned to ophthalmologist Carson's office in April 2004. Dr. Carson suspected glaucoma secondary to diabetes. [Tr. 235]. Again, the court's review of Dr. Carson's handwritten notes does not reveal a diagnosis of cataracts or an assessment that plaintiff is "20 points from being blind in left eye." Plaintiff was also evaluated by ophthalmologist Edward Peterson, whose MRI review indicated no connection between

plaintiff's fatty tumor and her complaints of headaches. [Tr. 407]. Dr. Peterson's assessment made no mention of cataracts or virtual blindness in the left eye. [Tr. 407].

Plaintiff also returned to neurosurgeon Meric's office in April 2004. Dr. Meric noted that "[s]he returns doing fairly well and is completely at her baseline. She still has recurrent headaches and multiple other problems related to her obesity that she is aware of and says that she is working on." [Tr. 242].[12] Regarding the fatty tissue mass above the right eye, Dr. Meric opined that

> it is unchanged as far as I can tell. There is no mass effect of any kind and no pressure on the intraorbital contents. This is most likely just as we suspected previously, a lipoma that is generated by intraorbital fat escaping through the fracture site previously. The lipoma will probably remain forever, and unless it should grown substantially in size or cause significant problems with mass effect, then surgical treatment should not be considered. She does not need routine surveillance scans, but I would recommend that she have another MRI of the brain . . . in about 4-5 years for routine followup.

[Tr. 242]. Dr. James Cox, reading a July 2004 CT scan, agreed that the "small" lipoma was "unchanged" and termed the CT results "negative." [Tr. 375].

At her five appointments with FNP Manting between May and September 2004, plaintiff continued to report no seizure issues. [Tr. 360-64]. At a May 2004 appointment, she was purportedly "following the low cholesterol diet." [Tr. 363].[13] She also told FNP Manting on that date that "she was told she has cataracts[.]" [Tr. 363].

---

[12] The court again notes plaintiff's admission to the Commissioner - a mere three days after her appointment with Dr. Meric - that she does little more than watch television and eat "junk." [Tr. 119, 122-23].

[13] *See* footnotes 10 and 12.

On six occasions between March and October 2004, plaintiff visited with Dr. Chavin's physician assistant, Elizabeth Beebe. Ms. Beebe noted shoulder tenderness, tenderness to palpation of the lumbar spine, and pain radiating into the legs. [Tr. 399-403, 419]. She continued plaintiff's medications and recommended diet and exercise. [Tr. 403]. In April 2004, plaintiff reported "doing very well this month" and was "trying to exercise and adjust her diet." [Tr. 402].[14] In June 2004, plaintiff reported "a great increase in pain over this month and has had to stop exercising." [Tr. 400]. By October 2004, plaintiff rated her pain as "9/10" and was reportedly ambulating with a cane. [Tr. 419].

Dr. Jack Scariano performed a neurological evaluation in September 2004. Plaintiff's chief complaint was ongoing headaches. [Tr. 409]. Dr. Scariano's record evidences no mention of seizures. [Tr. 408-09]. Plaintiff told him that she had been diagnosed with an orbital "lymphoma." [Tr. 409]. On examination, muscle tone was normal, muscle strength was full, and retinas were "clear." [Tr. 409]. Sensory, cerebellar, and cranial examinations were normal, and mental status examination was wholly unremarkable. [Tr. 408-09]. Dr. Scariano diagnosed, and gave information on, rebound headaches. [Tr. 408].[15]

---

[14] *See* footnote 12.

[15] "Rebound headaches can result when pain medications (analgesics) are taken too frequently to relieve headaches." *Raines v. Astrue*, No. 06-cv-0472-DFH-TAB, 2007 WL 1455890, at *1 (S.D. Ind. Apr. 23, 2007).

In September 2004, plaintiff visited with Cherokee psychiatrist Sukhender Karwan for the first time. Dr. Karwan described plaintiff as pleasant, cooperative, and in no acute distress. [Tr. 394]. Nonetheless, he diagnosed generalized anxiety disorder, major depression recurrent, and possible panic disorder with agoraphobia. [Tr. 394]. More specifically, Dr. Karwan wrote that,

> [s]he has been on several medications, most recently Zoloft (which "did not help her symptoms") which she ran out of a couple of weeks ago. She comes back in terms of despair, and frustrated easily, had a difficult time with her health. She generally does not leave home, quite claustrophobic, and thinks people are talking about her. She is concerned about her appearance and body weight, which she is morbidly obese[.]

[Tr. 394].

The Cherokee records also contain a vocational assessment dated October 21, 2004, with a signature that resembles that of Dr. Karwan. The form bears a second signature appearing to match that of an "LCSW Miller," whose signature also appears on five prior Cherokee documents (two intake interviews and three treatment plan reviews) between June 2001 and February 2004. [Tr. 194, 217, 219, 224, 396]. The assessment predicted that plaintiff would have either "[n]o useful ability to function" or "seriously limited, but not precluded" abilities in fourteen of the fifteen listed categories. [Tr. 392-93]. These conclusions were explained as follows:

> Patient diagnosed with major depression, recurrent, with psychotic features which includes difficulty with concentration, memory, irritability, social withdrawal which all greatly affect her ability to hold a job. Patient also diagnosed with anxiety and border line personality which creates emotional instability and disrupts patient's ability to relate to co-workers and supervisors.

[Tr. 392].

## C. November 2004 Through Date of ALJ's Decision

### 1. Allegations

At her November 2004 administrative hearing, plaintiff summarized the reasons that she purportedly cannot work.

> I can't focus for long periods of time and . . . I can't sit for very long or walk for very long and . . . my main thing is I, I can't be alone. I've not been by myself for quite a while because of my seizures and other things that's wrong with me. I have [a] caretaker with me all the time[.]

[Tr. 515]. Regarding her purported seizures, plaintiff testified that they occur "[a]bout a couple of times a month and I'm on, on [T]egretol for that but since the seizures are not slowing down, now, my doctors want to try me on [D]ilantin or something." [Tr. 515].[16] She further testified that "my memory is gone and they, they don't know why and they've done them electro things in my head and everything and they don't know if it's the tumors or what but something is like, just wiped me out[.]" [Tr. 517].

### 2. Medical Evidence

At the request of the Commissioner, John Thurman, Ph.D. performed a consultative psychological evaluation in January 2005. [Tr. 420-28]. When asked why she is unable to work, "The claimant stated: 'can't focus, don't get around good, seizures, and headaches.'" [Tr. 421]. Plaintiff reported that "crippling" headaches occur every two weeks

---

[16] Despite referencing "my doctors," plaintiff subsequently testified that no neurologist has ever treated her for her purported seizures, and that her only seizure treatment has come from nurse practitioner Manting. [Tr. 518-19].

that are, in her opinion, "caused by tumors." [Tr. 421]. Plaintiff also reported pain caused by, in her opinion, "my weight." [Tr. 422]. Psychologically, plaintiff complained of nightmares, hallucinations, mood swings, depression, crying spells, appetite and sleep disturbance, panic attacks, agoraphobia, and limited concentration, memory, and attention span, along with purported obsessive-compulsive habits involving lint rollers, locks, and M&M candies. [Tr. 422]. Dr. Thurman commented that plaintiff exhibited "no visible distress about [obsessive-compulsive] habits, appeared proud of them, thus does not meet diagnostic criteria." [Tr. 422]. He described plaintiff as alert and oriented, with adequate attention, concentration, and memory. [Tr. 423].

Dr. Thurman administered five tests of intelligence, personality, and/or symptom validity. [Tr. 424]. In material part, his discussion of the test results was as follows:

> In regards to validity testing, there appears to be a clear tendency to exaggerate and feign symptoms. This includes symptoms of psychopathology as well as cognitive impairments. . . . [T]he evaluation is most likely to be due to symptom exaggeration or feigning. . . .

> The validity test results should not be interpreted as evidence of malingering since a diagnosis of malingering implies feigning for secondary gain. The tests do offer strong evidence of feigning, but the motive for feigning is unclear. Rather than feigning for secondary gain (such as disability benefits), the client might be feigning because she enjoys being in the patient role. . . .

> Because of the evidence of symptom exaggeration, test results and client symptom reports should be interpreted with caution.

. . .

. . . It does seem likely that she has some mild to moderate Depressive and [post-traumatic stress disorder] symptoms. She also appears to have significant Personality Disorder Symptoms. I do believe it is likely that all three factors contribute to impairments in her daily functioning.

. . . Even with her questionable motivation and possible suppression of true ability . . . her scores suggest that her cognitive functioning would not interfere with her ability to perform most simple work related tasks such as comprehending, remembering and executing directions, making simple work related decisions, and doing simple arithmetic problems.

[Tr. 425-26].

Dr. Thurman's report ends with fourteen predicted vocational limitations. In addition to nine "mild" limitations, the report predicts that plaintiff would be "moderately" impaired in the following areas: understanding and carrying out complex and detailed instructions; working with the public; interacting appropriately with peers; interacting appropriately with supervisors; and adapting to the work setting. [Tr. 427-28].

Dr. Thurman also completed a separate vocational assessment form. Therein, he predicted that plaintiff would be "seriously limited but not precluded" in the following seven areas: relating to co-workers; dealing with the public; using judgment; interacting with supervisors; dealing with work stresses; behaving in an emotionally stable manner; and demonstrating reliability. [Tr. 430-31]. Dr. Thurman's two assessments are to some degree inconsistent. For example, although the assessment form predicted serious limitations of using judgment and dealing with work stresses, the narrative report concludes that plaintiff would only be mildly limited in those areas. [Tr. 427-28].

23

Plaintiff visited with Dr. Chavin's nurse practitioner in January 2005. Plaintiff described her pain as "5/10." The nurse practitioner noted a "reasonable level" of pain, improved quality of life, greater activity, "do[ing] quite well," and "really not . . . much to complain about[.]" [Tr. 434]. At her next appointment in February 2005, however, plaintiff described her pain as "8-9 out of 10." [Tr. 433].

Dr. Chavin performed a sacroiliac joint injection on March 22, 2005. In material part, his notes from that appointment state, "The patient's MRI shows only degenerative facet changes and some spondylosis, but no significant disc problems, no spinal stenosis, or disc herniation. Back pain is her most severe and significant pain. The patient is morbidly obese, and this contributes to her chronic low back pain." [Tr. 465]. At her next appointment on April 21, 2005, plaintiff stated that her pain averaged "8/10." [Tr. 464]. Conversely, at her next appointment on May 19, 2005, plaintiff stated that her pain averaged only "2/10." [Tr. 463].

At February 18 and May 4, 2005 appointments with FNP Manting, plaintiff expressly denied suffering from any headaches and she mentioned no seizure complaints. [Tr. 445-46]. On May 17, 2005, she complained to FNP Manting of headaches occurring only over the prior three days. [Tr. 444]. A CT scan of the brain, taken the previous day, was "normal." [Tr. 440]. On May 24, 2005, plaintiff reported that use of the medication Bupap "does help her headaches." [Tr. 443].

At the May 17 visit, FNP Manting made an "appointment for diabetic educator to discuss diet, etc[.]" [Tr. 444]. Plaintiff subsequently: (1) called back to reschedule the appointment; (2) appeared one day early for the rescheduled appointment and was told to come back the next day; and (3) was a "no show" that following day. [Tr. 443].

## V.

### Expert Testimony

Dr. Thomas Schacht testified as a medical advisor at the second administrative hearing. He opined that plaintiff has suffered no significant psychological limitation, other than perhaps for a "short period of time," as "the record appears to show[] that if she remains compliant with treatment, she tends to have good response." [Tr. 528, 531].

Cathy Sanders ("Ms. Sanders" or "VE") testified as a vocational expert at the second administrative hearing. The ALJ presented a hypothetical claimant of plaintiff's education and intelligence limited to sedentary work. If the hypothetical claimant experienced the restrictions predicted in Dr. Thurman's assessment form "(seriously limited, but not precluded and to related [sic] to coworkers, deal with the public, use judgment[,] [i]nteract with supervisors and deal with work stresses"), Ms. Sanders testified that all employment would be precluded. [Tr. 534].

The ALJ then adjusted the hypothetical psychological limitations to "can do lower level detailed work, limited but adequate in that area . . . better in work setting with few social demands and can adapt to changes in work setting, to infrequent changes in work

setting. . . . Few social demands and working with things rather than people. . . . [M]oderate difficulties in maintaining attention and concentration and moderate in social functioning[.]" [Tr. 534-36]. In response, the VE identified examples of jobs existing regionally and nationally that the hypothetical claimant could perform. [Tr. 535]. Ms. Sanders further testified that if Dr. Karwan's assessment were adopted, all employment would be precluded. [Tr. 537].

## VI.

### *Analysis*

### A. <u>RFC</u>

Plaintiff criticizes the ALJ's RFC conclusions by arguing that "[t]he ALJ's finding of other work is further flawed by the fact he asked the VE to consider a person capable of performing detailed work . . . when the ALJ himself found Plaintiff can only perform lower level entry work." [Doc. 11, p. 23]. The court first notes that plaintiff misstates the record. In his hypothetical, the ALJ presented a claimant capable of performing "*lower level* detailed work" - not merely "detailed work." [Tr. 534] (emphasis added). Further, plaintiff makes no effort to explain any meaningful distinction between the concepts of "lower level detailed work," as stated in the ALJ's hypothetical, and "lower level entry work," as stated in the ALJ's decision - particularly in light of the ALJ's explanation, both in the hypothetical and in his ruling, that plaintiff could work with "*things* rather than . . . people." [Tr. 22, 25, 535] (emphasis added). The issue is therefore waived. *McPherson v.*

*Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).

## B. Opinion Evidence

The Commissioner is not required to accept a physician's opinion if it is not supported by sufficient medical data and if a valid basis is articulated for the rejection. *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). Plaintiff's primary argument on appeal is that "[t]he ALJ has apparently rejected every medical opinion of record[.]" [Doc. 11, p. 16]. Plaintiff specifies four opinions which "the ALJ has apparently played doctor" in rejecting.[17]

---

[17] Also, throughout her briefing, plaintiff cites various mid-range to low Global Assessment of Functioning ("GAF") scores found in the record. These scores have no bearing on the court's analysis in light of plaintiff's grossly unreliable self-reporting.

> The [GAF] score is a *subjective* determination that represents the clinician's judgment of the individual's overall level of functioning. . . . [A] score may have little or no bearing on the subject's social and occupational functioning. . . . [W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a [GAF] score in the first place.
>
> Moreover, the Commissioner has declined to endorse the [GAF] score for use in the Social Security and [SSI] disability programs, and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings.
>
> . . .
>
> . . . Any failure to reference [GAF] scores or to compare different scores attributed to the same subject, without more, does not require reversal.

*DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415-16 (6th Cir. 2006) (citations and quotations omitted) (emphasis added).

## 1. October 2004 Cherokee Assessment

The Cherokee vocational assessment dated October 21, 2004, contains signatures appearing to be those of Dr. Karwan and LCSW Miller. The ALJ dismissed the extreme Cherokee assessment because "the foundation for the assessment . . . is based upon a one-time visit with a staff psychiatrist who was [not] one of the psychiatrists who regularly treated the claimant. This physician saw the claimant at a time when she had been non-compliant with treatment having been out of medication for several weeks." [Tr. 23]. The ALJ's explanation is supported by the record and is adequate grounds for rejecting the opinion.

Plaintiff's documented Cherokee appointments were for fifteen to twenty minutes [Tr. 394-95, 397] generally five months apart. Dr. Schacht's testimony agreed that Dr. Karwan's "only foundation for [the assessment] would be the single visit[] he had with her for medication management," where she was - as noted by the ALJ - in an unmedicated state. [Tr. 526]. The court further observes that Dr. Karwan's extreme assessment is, at a minimum, surprising in light of his prior description of plaintiff as pleasant, cooperative, and not in acute distress. [Tr. 394].

In response, plaintiff contends that the assessment was in fact prepared by LCSW Miller, who is purportedly her "long-time treating therapist" [doc. 11, p. 18], and thus the assessment is entitled to greater weight. According to plaintiff, from "June 26, 2001 through October 22, 2004[, d]uring this entire time, Plaintiff's therapist was LCSW Miller[.]"

[Doc. 11, p. 16]. Again, plaintiff misstates the record. By the court's reading of the administrative record, LCSW Miller's signature only appears on five Cherokee documents (two initial intake interviews and three treatment plan reviews) between June 2001 and February 2004. [Tr. 194, 217, 219, 224, 396]. Two initial interviews and three treatment reviews hardly constitute a "long-time treating" relationship.[18]

Lastly, the court is compelled to note that the Cherokee assessment appears to be based in part on plaintiff's subjective complaints. The evaluators cited plaintiff's self-reports of limited concentration and memory, social withdrawal, irritability, pain, and seizures. [Tr. 392, 394]. As the ALJ correctly noted, plaintiff's self-reporting is far from reliable. The inconsistencies rampant in plaintiff's claims have been detailed above and need not be repeated in full. The court instead notes the following, non-exhaustive sampling:

1. Plaintiff claims to be disabled by asthma, bronchitis, and other unspecified respiratory difficulties, yet she continues to smoke up to a pack of cigarettes per day.

2. Plaintiff claims to be disabled by diabetes, but does not check her blood sugar regularly.

3. Plaintiff claims to suffer from cataracts and virtual blindness in one eye, yet her ophthalmologists' records reveal no such diagnoses.

4. Plaintiff takes her prescribed medications only "if I remember," yet is able to faithfully adhere to a regular schedule of television programs "that I don't miss."

---

[18] Although the notes of LCSW Miller's August 2003 intake interview state in part that plaintiff "will continue with me for individual therapy" [Tr. 194], the administrative record does not show that any additional therapy sessions with LCSW Miller actually took place.

5. Plaintiff claims to be homebound by myriad physical problems yet is able to "regularly" go to the store where her purported caregiver is employed and "play games while her friend work[s]."

6. Plaintiff claims to regularly suffer from utterly horrific seizures (lasting up to two hours according to her family), yet she has barely sought medical attention for that condition and has not meaningfully pursued neurological care as recommended.  The administrative record reflects emergency room visits for "cough and wheeze" [Tr. 269], "vomit[ing] . . . green material" [Tr. 276], and a sore back secondary to moving furniture [Tr. 252], but only one such trip for her alleged extraordinary seizure disorder.  Further, the sole purported seizure for which she sought treatment lasted only ten minutes [Tr. 258] - making it the briefest of all her seizures according to the reports of her family members.  The record offers no explanation why plaintiff would seek medical care for this relatively minor event but not for devastating, "violent" seizures lasting between one and two hours.  It is simply unfathomable that a person who in fact suffers such devastating seizures on a regular basis would not seek meaningful medical care for that condition.

7. Plaintiff claims to suffer disabling pain related to her weight, yet she admittedly continues to eat "junk."

The ALJ was certainly within reason to view plaintiff's complaints with suspicion in light of the credibility issues rampant in the instant record.  Plaintiff's credibility is especially diminished by her noncompliance with diet, exercise, and medication in controlling her health conditions.  As cited in detail above, the record unquestionably contains substantial evidence to support the conclusion that plaintiff refuses to responsibly participate in her own health care.  Her style of life is utterly inconsistent with that of a person who suffers from the limitations alleged.  *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988).

The court stresses that these observations are not relevant merely to plaintiff's failure to lose weight. *See, e.g., Harris v. Heckler*, 756 F.2d 431, 435-36 n.2 (6th Cir. 1985) ("The [Commissioner] is certainly not entitled to presumptions that obesity is remediable or that an individual's failure to lose weight is 'wilful'. [sic] The notion that all fat people are self-indulgent souls who eat more than anyone ought appears to be no more than the baseless prejudice of the intolerant svelte.") (citation omitted). Instead, the court is astounded by plaintiff's apparent failure to ever genuinely *attempt* to adhere to a proper diet, lose weight, exercise, or monitor her blood sugar - even after multiple sources have directly related these strategies to her purported physical complaints.

> The Social Security Act did not repeal the principle of individual responsibility. Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences. If the claimant in this case chooses to drive [her]self to an early grave, that is [her] privilege – but if [s]he is not truly disabled, [s]he has no right to require those who pay social security taxes to help underwrite the cost of [her] ride.

*Sias*, 861 F.2d at 480.

## 2. Dr. Thurman

Following his psychological evaluation, Dr. Thurman generated both a report and a psychological assessment form which, as noted above, are to some extent inconsistent. Plaintiff argues that the ALJ erred by not accepting the more restrictive elements of Dr. Thurman's opinions.

The ALJ instead adopted the medical advisor's testimony, explaining that "Dr. Schacht assessed no limitations from a mental condition, stating that if the claimant is

compliant with treatment recommendations, she shows good response." [Tr. 22]. The ALJ gave greater weight to Dr. Schacht's opinion, which was based on a review of the entire record, rather than Dr. Thurman's opinion, which the ALJ noted to be "based upon a one-time examination with symptom exaggeration shown on" testing. [Tr. 22-23].

In light of plaintiff's extreme allegations, the ALJ took the extra steps of obtaining both a psychological evaluation and medical advisor testimony. To the extent that those sources conflicted, the ALJ adopted the opinion that he found most reasonable and he adequately explained his rationale for doing so. The court finds no error. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (The substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.") (citation omitted).

Further, Dr. Thurman's evaluation again highlights the issue of plaintiff's credibility. Plaintiff told Dr. Thurman that she suffers from "crippling" headaches "caused by tumors," even though her doctors have consistently told her that her lipoma *does not* cause headaches. Psychologically, plaintiff complained of nightmares, hallucinations, mood swings, depression, crying spells, appetite and sleep disturbance, panic attacks, agoraphobia, and limited concentration, memory, and attention span, along with purported obsessive-compulsive habits involving lint rollers, locks, and M&M candies. [Tr. 422]. Conversely, Dr. Thurman described plaintiff as alert and oriented, with adequate attention, concentration, and memory, and he discounted the obsessive-compulsive complaints.

Regarding symptom exaggeration, Dr. Thurman stressed that his testing was inconclusive as to whether plaintiff was malingering (for financial gain) or feigning (for attention). Dr. Schacht testified that malingering was more likely, and that "there is really no support for" a diagnosis of feigning. [Tr. 527, 531]. Either way, Dr. Thurman's conclusion on this point remains clear: "Because of the evidence of symptom exaggeration, . . . client symptom reports should be interpreted with caution." [Tr. 426].

### 3. Mental RFC Assessment

Plaintiff next criticizes the ALJ's handling of the November 2003 state agency Mental RFC Assessment. The state agency source predicted no limitations of more than a moderate degree, and further opined that plaintiff "can do lower level detailed work . . . [and] will do better in work settings with few social demands - work with things, not people." [Tr. 333-35]. According to plaintiff, "The ALJ barely mentioned this opinion in his decision and he failed to explain his apparent rejection of it." [Doc. 11, p. 22]. The court does not agree.

The above-cited explanatory language is found in Section III of the pre-printed Mental RFC Assessment form. The instructions for that section provide in material part, "Record in this section the elaborations on the preceding capacities. . . . Explain your conclusions in narrative form." [Tr. 335]. The cited elaboration was adopted both in the ALJ's vocational hypothetical and, for the most part, in his decision. The court finds no error whatsoever in the ALJ's decision to quote an explanatory narrative rather than a less-informative "check-a-box" form.

4. <u>Physical RFC Assessment</u>

Lastly, plaintiff criticizes the ALJ's treatment of Dr. Burr's January 2004 state agency Physical RFC Assessment. Dr. Burr predicted that plaintiff could work at the light level of exertion [Tr. 338], with no climbing of ladders, ropes, or scaffolds [Tr. 339], no concentrated exposure to respiratory irritants, and no exposure to hazards [Tr. 341]. While plaintiff correctly concedes that "[t]his is the only medical opinion of record regarding Plaintiff's physical limitations," she alleges error because "it is barely mentioned in the ALJ's decision." [Doc. 11, p. 22].

Although Dr. Burr found plaintiff capable of light work, the ALJ gave her "the full benefit of the doubt with regard to her subjective complaints" and restricted her to the lesser category of sedentary work. [Tr. 23]. To the extent that the ALJ did not discuss Dr. Burr's restrictions pertaining to climbing, respiratory irritants, and hazards, the court finds any potential error to be harmless.

Plaintiff offers no specific briefing on the climbing/irritants/hazards issue. [Doc. 11, p. 22-23]. Conversely, the Commissioner's Social Security Ruling 96-9p does speak to this point.

> Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds . . . would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work. . . .
>
> . . .

> . . . Even a need to avoid all exposure to [hazards] would not, by itself, result
> in a significant erosion of the [sedentary] occupational base.

SSR 96-9p, 1996 WL 374185 (July 2, 1996).  Further, plaintiff's subjective complaints

pertaining to respiratory irritants cannot be taken seriously as she continues to smoke up to

one pack of cigarettes per day.

      For the reasons stated herein, the Commissioner's final decision will be

affirmed.  An order consistent with this opinion will be entered.

ENTER:


          s/ Leon Jordan
         United States District Judge